**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

CHRYSLER GROUP LLC,                                    Case No. 11-11074

        Plaintiff,                                    Honorable Arthur J. Tarnow
                                                       Senior United States District Judge
v.

MODA GROUP LLC ET AL.

        Defendants.
_____/


**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION [12]**

**I. INTRODUCTION**

Plaintiff has filed this case alleging trademark infringement, false designation of origin, false descriptions, and unfair competition in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a), for false and deceptive trade practices under the laws of the State of Michigan, MICH. COMP. LAWS § 4415.901 *et seq.*, and all of the states in which Defendants have sold their products, and for unjust enrichment and unfair competition under state common law. Compl. ¶ 3.

Plaintiff seeks a preliminary injunction to enjoin Defendants Moda Group, LLC dba Pure Detroit, Kevin Borsay, and Shawn Santo (collectively, "Pure Detroit") from using the phrase "IMPORTED FROM DETROIT" ("IFD") during the pendency of this lawsuit. The Court, for the following reasons, denies the motion for preliminary injunction.

1

## II.  BACKGROUND

<u>Procedural History</u>

This case was filed on March 15, 2011.  Plaintiff filed a Motion for Preliminary Injunction [12] on March 25, 2011.  Defendants filed a Response [21] on April 18, 2011.  Plaintiff filed a Reply [25] on May 5, 2011.  The Court held an evidentiary hearing on May 20, 2011.

<u>The Parties</u>

Plaintiff primarily manufactures automobiles, but also sells products online.  Its principal place of business is in Auburn Hills, MI.  Chrysler's automobiles are produced, manufactured, and assembled outside of Detroit.  Its assembly plants are located in Sterling Heights, Michigan; Windsor, Ontario; and Brampton, Ontario.

Defendant, Pure Detroit, is a family owned business that specializes in selling products that promote and/or are made in Detroit.  All of Pure Detroit's stores are located in landmark Detroit buildings: the Fisher Building, the Guardian Building, and the Renaissance Center.  Pure Detroit sells its products on the internet also.  Pure Detroit contends that its whole purpose is "amping up" local culture.  Pure Detroit is involved in numerous residential, neighborhood, and urban development projects in Detroit.

<u>The Products</u>

In an effort to increase its sales and compete with foreign car companies, Plaintiff hired an outside marketing agency to develop a "repositioning campaign."  Plaintiff has spent more than fifty million dollars on its campaign.  Plaintiff introduced its campaign during the Superbowl with a two minute *Born of Fire* commercial.  *Born of Fire* (Chrysler commercial

broadcast on FOX Feb. 6, 2011).

Plaintiff has filed three trademark applications for the IFD phrase, one of which includes IFD in connection with t-shirts (Serial Nos. 85/237193, 85/219920, and 85/183477). All three applications have been approved for publication. Hrg. Tr., Exs. 19, 23, 26, May 20, 2011.

The only Chrysler product featured in the commercial is the Chrysler 200 model. There are no products with the IFD phrase on them in the commercial. At the end of the commercial, the screen fades to black, and the words "IMPORTED FROM DETROIT" appear on the screen for seven seconds. The Chrysler name and wing badge appear after the words fade.

After the commercial aired, Chrysler's website hits went from fewer than 500 hits per second to 13,244 hits per second. Garlick Dec. ¶ 9. Chrysler began selling t-shirts with the IFD phrase through its website. After the commercial, Defendants began making shirts featuring the IFD phrase. Defendants' shirts do not have the Chrysler logo or the Chrysler name on the shirt. Pure Detroit's shirts have its own signature stamp of the Spirit of Detroit on the back. One of the Defendants' ads for the shirts said:

> Imported From Detroit – Women's – Black: A tagline that is making headlines across America! Get your very own Imported From Detroit T-Shirt today. Grey Letters on a Ladies Black Tee. A Pure Detroit Exclusive!

Hrg. Tr., Ex. 37.

Plaintiff contacted Defendants shortly after finding out about the IFD shirts. Plaintiff requested that Pure Detroit cease and desist using the IFD phrase. Defendants refused and continue to sell shirts. Defendants also began selling tote bags and other variations of the t-shirt.

### III. STANDARD OF REVIEW

"A preliminary injunction is reserved for only the most egregious case, and should not be extended to cases which are doubtful or do not come within well-established principles of law." *Bonnell v. Lorenzo*, 241 F.3d 800, 826 (6th Cir. 2001). The moving party has the "burden of proving that the circumstances clearly demand [an injunction]." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

When evaluating a motion for preliminary injunction, the Court must consider four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Bonnell*, 241 F.3d at 809 (quoting *Rock & Roll Hall of Fame v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998)).

No single factor is controlling of the outcome, although if "there is simply no likelihood of success on the merits" that is usually "fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).

### IV. DISCUSSION

Plaintiff has failed to show that the extraordinary remedy of a preliminary injunction is warranted in this case. Plaintiff's arguments fall short on two critical factors: 1) irreparable harm and 2) strong likelihood of success on the merits. Plaintiff has the option of an adequate remedy at law, if it should ultimately succeed in the litigation. In addition, Plaintiff's failure to show that it has a strong likelihood of success on the merits is fatal to its request for a preliminary injunction. The remaining factors–substantial harm to others and the public interest–do not save Plaintiff.

### A. Irreparable Harm

Plaintiff argues that in the absence of a preliminary injunction it will suffer irreparable harm. Plaintiff has to show more than a "possibility of irreparable harm." *Winter v. Nat. Res. Defense Council, Inc.*, 129 S. Ct. 365, 375-76 (2008). Plaintiff has to show that "irreparable harm is likely in the absence of an injunction. *Id.*

This factor weighs on Defendants' side. There is no presumption of irreparable harm. Important is the fact that Plaintiff will have an adequate remedy at law if it prevails. *CSX Transp., Inc. v. Tennessee State Bd. of Equalization*, 964 F.2d 548, 551 (6th Cir. 1992) ("[A]n injunction generally should not issue if there is an adequate remedy at law.") (citing *EBSCO Indus. v. Lilly*, 840 F.2d 333, 335-36 (6th 1985)). As Defendants argue, sales data of the three Pure Detroit stores can be easily quantified. Defs.' Resp. [21], at 21. Plaintiff could recover damages if it ultimately prevails. This factor weighs against the issuance of a preliminary injunction. *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992) ("[A] plaintiff's harm is not irreparable if it is fully compensable by money damages.").

### B. Likelihood of Success on the Merits

Plaintiff argues that it has a protectable trademark—"Imported from Detroit"—and that Pure Detroit is unlawfully infringing it. Pure Detroit argues that Plaintiff does not have a trademark and that trademark law is therefore inapplicable. In the alternative, Defendants provide several arguments as to why a preliminary injunction is inappropriate.

### 1. Applicability of Trademark Law

As a threshold issue, Defendants raise the argument that trademark law is inapplicable here because neither Chrysler nor Pure Detroit use the IFD phrase as a trademark. Defs.' Resp. [21], at 8-10. The Court disagrees and finds that trademark law will likely be applicable in this case.

Plaintiff argues that the IFD phrase is a trademark and that trademark use begins when the owner makes a bona fide use of the designation in connection with its goods as a part of an "ongoing program to exploit the market commercially." Pl.'s Reply [25], at 2-3 (quoting *Allard Enters. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 359 (6th Cir. 1998)). Plaintiff argues that the introduction of the campaign and the continuous commercial use of the IFD phrase and products is trademark use. *See Allard*, 146 F.3d at 359. Defendants' argument that it does not use IFD as a trademark but as an expressive statement is well-taken. Defs.' Reply [27], at 2. Nevertheless, as Plaintiff points out, under the Lanham Act, Defendants' use in a manner that is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association . . . as to the origin, sponsorship, or approval of [its] goods . . . ." is sufficient to establish false designation. 15 U.S.C. § 1125(a)(2)(A) (2006). Therefore, the Court finds that Plaintiff is likely to succeed in establishing that trademark law is applicable.

### 2. IFD As a Protectable Trademark

Chrysler brings its claim under Section 43(a) of the Lanham Act for trademark infringement. 15 U.S.C. § 1125(a); *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760-61 (6th Cir.

2005) (internal citations omitted). To succeed, Plaintiff must show that: 1) it has a protectable trademark and 2) that Pure Detroit's use of the IFD phrase results in a likelihood of confusion. *Id.* To be protectable, a mark must be distinctive. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992). A mark is distinctive if it either: 1) is inherently distinctive or 2) has acquired distinctiveness through secondary meaning. Marks are classified in order of increasing distinctiveness as: 1) generic; 2) descriptive; 3) suggestive; 4) arbitrary; or 5) fanciful. A mark is "inherently distinctive" if it is suggestive, arbitrary, or fanciful. A mark that is not inherently distinctive can be rendered distinctive if it acquires a secondary meaning. *Id.*; *Tumblebus*, 399 F.3d at 760-61. Generic terms are not protectable.

### a. Whether Plaintiff Has a Protectable Trademark

Plaintiff has not shown that it has a protectable trademark. Plaintiff has not shown that the IFD phrase is inherently distinctive. Nor has it shown that it has acquired distinctiveness through a second meaning.

<u>"Inherently Distinctive" or Geographically Descriptive</u>

Only trademarks that are "distinctive" as a matter of law are protectable. *Leelanau Wine Cellars, LTD v. Black and Red, Inc.*, 502, F.3d 504, 512 (6th Cir. 2007). Descriptive terms that are not inherently distinctive may only be protected if they are proven to have acquired a secondary meaning. *DeGidio v. W. Grp. Corp.*, 355 F.3d 506, 510 (6th Cir. 2004).

The line between a "descriptive" mark and a "suggestive" mark is thinly drawn. *Tumblebus*, 399 F.3d at 763. In determining whether a mark is suggestive, the court should

consider "the degree of inferential reasoning necessary for a consumer to discern" the goods provided in connection with the mark. *Tumblebus*, 399 F.3d at 763. Inferential reasoning is required if seeing the mark in isolation would not necessarily identify the goods offered. *See id.*

"The Lanham Act does not protect primarily geographically descriptive marks." *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 594 (6th Cir. 1989). "Where it is determined that a mark as perceived by potential purchasers describes the geographical origin of the goods the mark is primarily geographically descriptive." *Id.* at 595; *Leelanau*, 502 F.3d at 513 ("A geographically descriptive term or phrase is one that designates a geographical location and would tend to be regarded by buyers as descriptive of the geographic location of origin of the goods or services.").

Plaintiff contends that the IFD phrase is inherently distinctive. Plaintiff argues that it is impossible for an American to "import" a vehicle from "Detroit." Pl.'s Mot. [12], at 9. Plaintiff argues that the IFD phrase is a "clever commentary underlying the play on words," requiring a "mental leap" to identify the underlying goods. *Id.* at 9-10. The Court disagrees.

The IFD phrase is not inherently distinctive; it is geographically descriptive. There is no mental leap required to understand the phrase, as Plaintiff suggests. The phrase describes that the product is "imported from Detroit," simply describing the geographical origin of the goods as the city of Detroit. *Burke-Parsons-Bowlby Corp.*, 871 F.2d at 594 ("Where it is determined that the mark as perceived by potential purchasers describes the geographic origin of the goods the mark is primarily geographically descriptive.") (internal citation omitted); *see also Ligotti v. Garafalo*,

8

562 F.Supp.2d 204, 215 (D. N.H. 2008) (finding the phrase ["THE GUY FROM BOSTON"] is not protectable because it simply describes a regular guy from Boston with no inference required at all).

Plaintiff's own testimony was that the IFD phrase is used to influence Americans to buy cars from the Motor City–Detroit–instead of foreign imports. *See* Hrg. Tr. 32. IFD serves exactly that purpose. It lets buyers know that its cars are from the Motor City. There is no mental leap or inference required.

Plaintiff points to a case where the Court granted a preliminary injunction for infringement against MIDWEST GUARANTY, despite the term "Midwest" being geographically descriptive. *See Midwest Guaranty Bank*, 270 F. Supp. 2d 900, 907 (E.D. Mich. 2003). The IFD phrase, however, is distinguishable from the MIDWEST GUARANTY BANK mark that was found to be possibly protectable. In that case, the Court reasoned that the term "guaranty," in conjunction with the other terms, made the phrase suggestive and possibly protectable. *Midwest Guaranty*, 270 F. Supp. at 911. Here, there are only words that commonly describe the geographic origin of something. Defendants' expert correctly notes that to "import" something is to take something from one place to another. Defs.' Sur-Reply [27], at 2. The word "from" is a preposition that is commonly used to indicate source or origin. "Detroit" is a geographic location. These terms separately and together indicate a geographic description. *Id.*

Therefore, the Court finds that it is unlikely that Plaintiff will show that the IFD phrase is inherently distinctive. It is likely geographically descriptive and not protectable.

9

Distinctiveness Acquired by Secondary Meaning

Plaintiff argues, in the alternative, that the IFD phrase has acquired distinctiveness through secondary meaning at this early stage of the litigation. Pl.'s Mot. [12], at 10. The Court disagrees.

"The evidentiary burden necessary to establish secondary meaning is substantial." *Burke-Parsons*, 871 F.2d at 596 (citing *Bank of Texas v. Commerce Sw., Inc.*, 741 F.2d 785, 787 (5th Cir. 1984)). "To demonstrate secondary meaning, the evidence must show that in the minds of the public, the primary significance of the trade dress is to identify the source of the product rather than the product itself." *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 418 (6th Cir. 2007) (internal citations omitted). "A geographically descriptive mark that has acquired secondary meaning no longer causes the public to associate the goods at issue with a particular place but to associate the goods with a particular source." *Leelanau*, 502 F.3d at 504.

To determine secondary meaning, the court looks at seven factors: 1) direct consumer testimony; 2) consumer surveys; 3) exclusivity, length, and manner of use; 4) amount and manner of advertising; 5) amount of sales and number of customers; 6) established place in the market; and 7) proof of intentional copying. *Id.* No single factor is determinative and not all factors must be proven. *Midwest Guaranty Bank*, 270 F. Supp. 2d at 911-12. "The duration of use of the mark can establish secondary meaning where the duration is more than a relatively short period." *Burke-Parsons*, 871 F.2d at 596.

The first two factors will not be considered; Plaintiff has not presented consumer testimony or consumer surveys. As to the third factor–exclusivity, length, and manner of use–Plaintiff mentions that "only a short time has passed since Chrysler unveiled the [IFD phrase] . . . ." Pl.'s Mot. [12], at 11. This statement by Plaintiff does not support its position, as more than a short period of time is required to establish secondary meaning. *See Burke-Parsons*, 871 F.2d at 596. This factor weighs against the finding of the acquisition of a secondary meaning.

Plaintiff argues that the amount and manner of advertising is proof of acquisition of secondary meaning. Pl.'s Mot. [12], at 11. Plaintiff argues that the commercial and campaign ensured that the IFD phrase was well-known instantaneously with over 94 million viewers seeing the commercial. *Id.* Plaintiff spent over fifty million dollars on the repositioning campaign. Hrg. Tr. 58.

While expense is an indication of an attempt to establish a secondary meaning, it is not proof alone that a secondary meaning exists. *Citizens Banking Corp. v. Citizens Fin. Grp., Inc.*, No. 07-11514, 2008 WL 1995104, at *4 (E.D. Mich. May 6, 2008) (internal citations omitted), *aff'd*, 320 Fed. App'x 341 (6th Cir. 2009). Therefore, Plaintiff's millions of dollars spent are surely an indication that it wanted to establish secondary meaning. It is not conclusive. As Defendants argue, Plaintiff's commercial was only one of many car commercials during the Superbowl. The advertising expenditures are required to survive in the market and are not conclusive proof of secondary meaning. *See id.* at *4. Nevertheless, this factor likely weighs in Plaintiff's favor.

As to the amount of sales and number of customers, Plaintiff argues that as a result of the popularity of the *Born of Fire* commercial, it sold out of more than 1,750 t-shirts bearing the phrase in a few hours. Pl.'s Mot. [12], at 11. Since then Plaintiff has sold more than 5,800 items with the IFD phrase. *Id.* This factor weighs in Plaintiff's favor.

As to the sixth factor, Plaintiff fails to show that the IFD phrase was established in the marketplace prior to Defendants' use of the phrase. "Secondary meaning must be established prior to [another's] use . . . ." *Burke-Parsons*, 871 F.2d at 596 (citing *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir. 1980)). Defendants began making t-shirts the day after the commercial aired and prior to Plaintiff making shirts. Plaintiff would essentially have to show that IFD acquired secondary meaning overnight. Plaintiff points to the high traffic on its website, articles, and online references that spiked in the few weeks after the commercial aired to show that secondary meaning was acquired. Pl.'s Mot. [12], at 11. As a matter of law, secondary meaning cannot be established instantaneously, as Plaintiff suggests. *See Burke-Parsons*, 871 F.2d at 596.

Finally, Plaintiff argues that Defendants intentionally copied the phrase from the Superbowl Commercial. Pl.'s Mot. [12], at 11. "Intentional copying may be used to show secondary meaning . . ., but it is only one of many considerations in that test and does not alone establish secondary meaning." *Gen. Motors Corp.*, 468 F.3d at 419. While Defendants knew of the Chrysler commercial before making the shirts, "mere knowledge of the competitor's mark is insufficient as a matter of law to prove intentional copying." *DeGidio*, 355 F.3d at 514.

12

"Intentional copying is not actionable under the Lanham Act absent evidence that the copying was done with the intent to derive a benefit from the reputation of another." *DeGidio*, 355 F.3d at 514.

Pure Detroit argues that it never intended or attempted to derive a benefit from Chrysler's reputation. Defs.' Resp. [21], at 14. Pure Detroit contends that it used the IFD phrase to promote a social movement–pride in Detroit–which is the purpose of its entire company. Here, the Court finds Defendants' testimony to be credible. However, as Plaintiff points out, Defendants specifically stated in their t-shirt advertisements that the t-shirt contained "A tagline that is making headlines across America!," allegedly referencing Plaintiff's commercial. The Court finds that as to this factor, it is a close call. The factor slightly weighs on Plaintiff's side.

Considering the seven factors, Plaintiff has not shown the acquisition of a secondary meaning. Plaintiff has shown that three out of the seven factors weigh on its side. As to two of those factors–1) amount and manner of advertising and 2) proof of intentional copying–Defendants have presented meritorious responses. Plaintiff has not met its "substantial burden" in establishing the secondary meaning of the IFD phrase. *See Burke-Parsons*, 871 F.2d at 596. Therefore, Plaintiff has not shown that there is a strong likelihood of success on the merits.

### b. Likelihood of Confusion

Plaintiff has also failed to show that it would likely succeed in showing a likelihood of confusion. Under § 43 of the Lanham Act, protection is provided against likelihood of consumer

confusion. *See* 15 U.S.C. § 1125(a). It protects against source confusion and confusion as to "affiliation, connection, or association" or the "origin, sponsorship, or approval" of the goods. *See id.* The court will look at the following factors: 1) strength of plaintiff's mark; 2) relatedness of the goods; 3) similarity of the marks; 4) evidence of actual confusion; 5) marketing channels used; 6) likely degree of purchaser care; 7) defendant's intent in selecting the mark; and 8) likelihood of expansion of the product lines. *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir. 1997); *see also Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 630 (6th Cir. 2002).

      Strength of Mark

The stronger the mark, the broader the protection. *Champions Golf Club*, 78 F.3d at 1117. The court looks at three factors to determine the strength of the mark: 1) the mark's unique nature; 2) the owner's "intensive advertising efforts"; and 3) the type of mark it is (i.e. generic, descriptive, suggestive, arbitrary, or fanciful). *See Express Welding, Inc. v. Superior Trailers, LLC*, 700 F. Supp. 2d 789 (E.D. Mich. 2010).

Plaintiff has a likely descriptive mark that is not afforded the broad protection that it seeks. The descriptive IFD phrase does not support a finding of uniqueness, despite the millions of dollars it has spent on the campaign. Even if the mark is ultimately determined to be strong in the automotive industry, Defendants correctly argue that any protection is not applicable to clothing. *See e.g.*, *Anheuser-Busch, Inc. v. Florists Ass'n of Greater Cleveland, Inc.*, 603 F. Supp. 35, 37 (N.D. Ohio 1984) (allowing a defendant florist to use the slogan "This Bud's For

You" because it had no "strength with respect to fresh-cut flowers"); *see also Checkpoint Sys., Inc. v. Check Point Software Tech., Inc.*, 263 F.3d 270, 283-84 (3rd Cir. 2001) (while the plaintiff's "CHECKPOINT" mark was found to be strong in the physical article security market, it was weak in the information technology market).

Even if Plaintiff had a protectable mark, Plaintiff has not shown that it is strong as to clothing. Plaintiff's case for a protectable trademark is based on the success of the Superbowl commercial, which only featured one Chrysler model and focused on the "Motor City." Therefore, this factor weighs against the finding of any likelihood of confusion.

<u>Relatedness of the Goods, Similarity of Marks, and Marketing Channels</u>

The sale of identical goods to overlapping consumers through similar channels of trade supports a finding of a likelihood of confusion. *See WSM, Inc. v. Tennessee Sales Co.*, 709 F.2d 1084, 1086 (6th Cir. 1983). To determine relatedness, the court considers "[w]hether goods . . . with comparable marks that are similarly marketed and appeal to common customers are likely to lead consumers to believe that they come from the same source, or are somehow connected with or sponsored by a common company." *Therma-Scan*, 295 F.3d at 633.

On a superficial level, Plaintiff has shown that there are similarities. Both parties sell inexpensive t-shirts with the words "Imported from Detroit." They are sold over the internet. A closer look, however, shows that the goods are not as similar as Plaintiff claims.

In *Kellogg Co v. Toucan Golf*, 337 F.3d 616 (6th Cir. 2003), Kellogg argued that Toucan Golf infringed on its registered "Toucan Sam" mark when it used a mark featuring a toucan next

to the phrase "Toucan Gold." *Id.* at 621-22. The Sixth Circuit found that it was unlikely that a consumer would confuse the toucan in the golf ads with the toucan in the cereal ads. *Id.* at 625. Here, Defendants argue that they have novelty clothing and unique gifts that represent and/or are "from Detroit." Therefore, there would be no confusion that it was related to Chrysler. Defs.' Resp. [21], at 16. The Court agrees.

Defendants also argue that the IFD phrase is used in a different way by each party. Defs.' Resp. [21], at 17. Chrysler always uses the IFD phrase along with the Chrysler wing badge. Hrg. Tr. 66-67. Plaintiff uses its own Pure Detroit trademark on its shirts, thereby reducing the likelihood of confusion.

As to the marketing channels, Defendants argue that under *Therma-Scan*, it is undisputed that the parties have different customers and market their goods and services in different ways, therefore decreasing the likelihood of confusion. Defs.' Resp. [21], at 17 (citing *Therma-Scan*, 292 F.3d at 636). Plaintiff has a multinational network of car dealerships. Pure Detroit is a small company, with only three retail stores in Detroit. Each serve different industries and markets. Defendants argue that their marketing approaches are "quite different." *See Little Ceasars Enters., Inc. v. Pizza Ceasar, Inc.*, 834 F.2d 568, 572 (6th Cir. 1987) (finding sophisticated and televised advertising program by national pizza franchise was different from that of a small, local company in the same industry).

This factor weighs against the finding of a likelihood of confusion. It is hard to believe that a consumer shopping at Pure Detroit would think that the shirts are coming from Chrysler or

16

that it was related to Chrysler. The fact that both companies use their own house marks (i.e. Chrysler's wing badge and Pure Detroit's house mark) on their shirts also reduces the likelihood of confusion.

### Likely Degree of Purchaser Care

Consumers do not exercise a high degree of care when buying relatively inexpensive goods. *See Audi AG v. D'Amato*, 469 F.3d 534, 544 (6th Cir. 2006). The standard for determining whether the ordinary buyer would differentiate between products with similar trademarks is the exercise of ordinary caution. *Therma-Scan*, 295 F.3d at 638. Plaintiff argues that the goods are inexpensive, thus rendering the degree of care very low. Pl.'s Mot. [12], at 16-17.

Defendants argue that while the shirts are inexpensive and a t-shirt might not normally be an item that consumers take great care in buying, Defendants' shirts are different. Defs.' Resp. [21], at 18. Defendants argue that their shirts are "self-expressive" and therefore the ordinary buyer would exercise an increased level of care in purchasing the shirt from them.

The Court finds that this factor does not weigh heavily on either side. The shirts are inexpensive, but Defendants raise a valid and meritorious response. This factor is neutral.

### Intent in Selecting the Mark

"If a party chose a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity." *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 799 (6th Cir. 2004) (quoting *Homeowners Grp., Inc. v. Home Marketing Specialists,*

*Inc.*, 931 F.2d 1100, at 1111 (6th Cir. 1991)). "[T]he intent of a party in adopting another's mark is a critical factor, since if the mark was adopted with the intent of deriving a benefit from the reputation of the plaintiff, that fact alone may be sufficient to justify the inference that there is confusing similarity." *Ferrari v. Roberts*, 944 F.2d 1235, 1242 (6th Cir. 1991). However, even a bad-faith intent to infringe a protected mark may not increase the likelihood of confusion if the other factors suggest that confusion is not likely. *AutoZone*, 373 F.3d at 799.

Plaintiff's have not shown that Defendants intended to cause confusion or derive a benefit from Plaintiff's reputation. In this case, Plaintiff's mark has not been deemed protectable. Therefore, it would be unreasonable to infer intent here. Defendants have a well-reasoned and supported argument that Defendants used the phrase to express a social movement to have pride in Detroit. Defendants genuinely believe that Plaintiff's mark is not protected as evidenced by their vigorous and strong argument that IFD is a primarily geographically descriptive phrase. Furthermore, the other factors suggest that confusion is not likely. This factor weighs on Defendants' side.

### Likelihood of Expansion of Product Lines

Plaintiff is primarily in the automotive industry. Plaintiff argues that it historically has sold "lifestyle products" bearing its brand name, logos, and slogans. Pl.'s Mot. [12], at 16. Plaintiff is selling hats, stickers, sweatshirts, and tank tops with the IFD phrase. *Id.* at 15-16. Plaintiff concludes that if Defendants start selling other items (i.e. hats, bags, stickers, etc.) it could possibly cause confusion. *Id.* The Court finds that this factor weighs on Plaintiff's side.

<u>Actual Confusion</u>

Both parties agree that there is no evidence of actual confusion of the marks and that it is not required for Plaintiff to succeed on this factor. Pl.s' Mot. [12], at 17; Defs.' Resp. [21], at 17.

<u>Balancing the Factors to Determine the Likelihood of Confusion</u>

In Conclusion, only one factor weighs on Plaintiff's side. Therefore, even if the Court would have found a likely protectable mark, Plaintiff has failed to establish a likelihood of confusion. Since there is likely not a protectable mark and no likelihood of confusion, Plaintiff has failed to show a strong likelihood of success on the merits.

**C.     Substantial Harm to Others**

The harm to Defendants would be minimal. They would lose the inventory already purchased. The IFD shirts only constitute a portion of their products. This factor weighs on Plaintiff's side.

**D.     Public Interest**

Plaintiff argues that the public interest would be served since part of its proceeds go to charity. Pl.'s Mot. [12], at 19-20. Defendants respond that an injunction would hurt the public because it would deprive them of choice in the market. Defs. Resp. [21], at 22. The Court finds that this factor does not weigh on either side.

**V.  CONCLUSION**

Plaintiff has not shown that it will suffer irreparable harm if a preliminary injunction does not issue. Additionally, Plaintiff's failure to show a strong likelihood of success on the merits is fatal to its request for a preliminary injunction. For the reasons discussed above, and the Court

being fully advised in the premises,

      IT IS ORDERED that Plaintiffs' Motion for Preliminary Injunction [12] is DENIED.

      IT IS SO ORDERED.


                                                 s/Arthur J. Tarnow
                                                 Arthur J. Tarnow
                                                 Senior United States District Judge

Dated:  June 28, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 28, 2011, by electronic and/or ordinary mail.

                                        s/Catherine A. Pickles
                                        Judicial Assistant